**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-10861

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RONALD W. HUGHES, SR.,

BETTY L. ALLEN,

and

JERRI D. ALLEN,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Northern District of Texas
(3:94-CR-075-X)
_____

October 30, 1996


Before POLITZ, SMITH, and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Ronald Hughes, Sr., Betty Allen, and Jerri Allen appeal their convictions and sentences for conspiracy to launder money and for

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

individual acts of money laundering. Finding no error, we affirm.

I.

Ronald Hughes, Sr. ("Hughes"), ran his family's funeral home business near Dallas. In June 1989, Hughes was visiting with Harry Pierce, an old acquaintance who was at the time doing odd jobs for Hughes, at the site of a church in Cedar Hill, Texas, that Hughes had purchased recently and intended to convert into a funeral home. At this meeting, Pierce asked whether Hughes knew "where a person could invest some money on a long-term basis and where they could earn some interest." Pierce stated that he knew Betty Allen ("Allen"), who had about $1 million that she was looking to invest. Hughes responded that he was in fact looking for approximately that amount to complete the financing on his new funeral home conversion project.

Shortly thereafter, Pierce arranged a meeting with Hughes and Allen, at which meeting Allen agreed to loan Hughes $1 million. Allen related to Hughes that the money had come from a now-deceased, former lover (Joe Brown) who had been distrustful of banks and who liked to keep large sums of cash around. Hughes and Allen closed the loan transaction on July 1, 1989, and a local attorney prepared the necessary documentation. Allen instructed the attorney to make the note payable to Allen and Robert Chambers, explaining that Chambers was a friend of hers and Joe Brown's who

2

had an interest in the money that Brown had left her.[1]  At the behest of Hughes's attorney, Allen also provided Hughes with a written statement representing that none of the loan proceeds was derived from illegal activity.  Hughes and Allen agreed that the money§§all delivered in cash§§would be deposited in increments of less than $10,000 each.  Hughes proceeded to do this, making nearly 200 separate deposits of cash in eleven different financial institutions during the course of his dealings with Allen.

On July 20, 1989, Pierce telephoned Hughes and explained that Allen had asked Pierce to meet her in Scottsdale and then fly back with her to Dallas.  Because he was unable to do so, Pierce requested that Hughes go in his place.  Hughes agreed and flew the following day to Scottsdale aboard a chartered plane that had been arranged by Pierce.

Upon his arrival, Hughes met Allen, who said she needed him to accompany her on an errand, at which time the two drove to a storage facility in Phoenix and removed approximately $2 million in cash from a safe located in the facility.[2]  Hughes and Allen

---

[1] Chambers, prior to his arrest in 1991, smuggled marihuana and cocaine into the United States from Mexico and Colombia.  He was reportedly the last "soldier" left in the Pablo Acosta drug organization.  According to the government, Chambers gave some of the currency that he earned in this drug trade to Allen so that she could help him hide the money.  After his arrest and conviction, Chambers entered into a plea bargain and agreed to testify against Allen and company in this action in exchange for leniency in sentencing.

[2] The parties contest ownership of the money.  According to Hughes, Allen indicated that the money had been placed in the safe.  Allen maintains, however, that the money came from Joe Brown.  The government contends that the money belonged to Chambers and had been placed with a girlfriend of Chambers's in Phoenix prior to its being moved to the storage facility.

3

returned with the money to the Scottsdale airport and flew to Dallas, whereupon Hughes delivered the money, per Allen's instructions, to Pierce's apartment.

Hughes subsequently received a second call from Allen in which she indicated that she had an additional $1.9 million to invest with Hughes.[3]  The money that formed the basis of this second loan had been brought from Alpine, Texas, by Pierce, Allen, and Jerri Allen ("Jerri"), Allen's daughter.  The three passengers had flown to Alpine aboard Allen's airplane, where a pickup truck pulled up to the plane and loaded the money aboard in trunks and bags.  Hughes met the group at the Dallas airport upon their return and took the moneySSagain all of it in cash.  The note evincing this loan transaction was executed on November 1, 1989.

Although it is undisputed that Chambers came to Dallas on August 8, 1989, to meet with Hughes, the parties dispute virtually every facet of the meeting.  The government claims that at this meeting Chambers told Hughes that the money belonged to him and that he had had an extensive relationship with Acosta and was "the last soldier left in the [Acosta] organization."  According to the government, Hughes then told Chambers that he had had a former FBI agent friend of his run a check on Chambers and that this friend would help them stay apprised of whether the IRS was conducting any money laundering investigations in the area.

---

[3] None of the parties contests the amount of the loan, although the second note reflects only that $1 million was loaned to Hughes.

4

Hughes contests this account, saying that Chambers told him that he was a former Green Beret who had done a few favors for Mexican law enforcement personnel. Although Hughes does not dispute that he told Chambers that he had run an FBI check on him, Hughes claims that he never did so and was only making comments to that effect to "level the playing field." Hughes also points out that the former FBI agent testified at trial that he had not run such a check until April 1990. Hughes does concede, however, that Chambers indicated that the money was his, that he had once worked for a man named Pablo Acosta, that he had inherited Acosta's turf, and that Acosta was "like a godfather" to him.

Hughes had no further contact with Chambers until April 1990, when the two met with Allen and Jerri. Ostensibly, the meeting was called to figure out where all the money (nearly $5 million in total) had gone and who was responsible. The meeting degenerated into a shouting match between all of the parties and was followed by Chambers's mad search through a mausoleum owned by Hughes in which Chambers believed that Allen and Hughes had hid the money. To everyone's knowledge except Hughes, the meeting was recorded on audio tape.

Chambers was arrested in 1991 and, after being convicted, agreed to testify in the instant case in exchange for leniency in sentencing. Hughes was charged with various counts of money laundering and structuring, Allen with various counts of money laundering, Hughes's son with various counts of structuring, and

5

Jerri with two counts of structuring and one count of money laundering. Hughes, Allen, and Jerri also were charged with conspiracy to launder.

Hughes was convicted by a jury on all but one of the laundering charges and acquitted on all of the structuring charges. Allen was convicted on all counts, while Jerri was convicted only on the laundering counts. Hughes's son was acquitted on all charges.

II.

A.

Hughes, Allen, and Jerri first contend that the district court erred in failing to instruct the jury that, as to the money laundering counts, the government was required to show that each possessed actual knowledge that the funds involved in those counts were the product of criminal activity. According to the defendants, the court's failure to adopt their instruction permitted the jury to convict upon a showing of the lesser standard of constructive knowledge.

We review the district court's decision for abuse of discretion. *United States v. Sellers*, 926 F.2d 410, 414 (5th Cir. 1991). The refusal to give a jury instruction constitutes reversible error only where the instruction (1) was substantially correct, (2) was not substantially covered in the charge delivered to the jury, and (3) concerned an important issue so that the failure to give it

seriously impaired the defendant's ability to present a given defense. *United States v. Pennington*, 20 F.3d 593, 600 (5th Cir. 1994).

The defendants' proposed instruction was substantially correct.[4] The government does not dispute that "actual knowledge" that the proceeds of unlawful activity were involved in the laundering is an element of the crime. Actual knowledge requires at a minimum a showing of the defendant's subjective belief that the fact at issue existed. *See United States v. Breque*, 964 F.2d 381, 389 (5th Cir. 1992), *cert. denied*, 507 U.S. 909 (1993). The defendants' jury instruction elucidated as much and thus was substantially correct.

We conclude, however, that the defendants' proposed instruction was substantially covered in the charge delivered to the jury. The actual charge given was as follows:

> In order to establish a violation of the statute, the government must prove beyond a reasonable doubt . . . <u>Second</u>: That the Defendant under consideration *knew* that the property involved in the financial transaction represented the proceeds of some form of unlawful activity . . . . The phrase "knowing that the property involved in the financial transaction represented some form of unlawful activity" means that the person *knew* the property involved in the transaction represented the proceeds from some form, though, not necessarily which

---

[4] The proposed instruction was as follows: "In order to find that the defendant whom you are considering believed that the property involved was the proceeds of one or more forms of unlawful activity, as set forth above, you must be convinced beyond a reasonable doubt that the defendant actually believed that proceeds of unlawful activity were involved. Reason to know, carelessness, suspicion, or even reckless disregard of the facts that the proceeds of unlawful activity were involved is not enough to satisfy the standard."

7

form, or activity that constitutes a felony under State or Federal law. . . . [The government] need only prove that he or she *knew* that it represented the proceeds of some form, though not necessarily which form, of felonious activity under State or Federal law. [Emphasis added.]

The statute requires that the government prove actual knowledge, and the court so instructed the jury, using the word "knew" three times in two paragraphs of the instruction. The court did not instruct that the government could prevail by demonstrating that the defendants "should have known" that the money was criminally tainted, and we do not conclude from the court's failure to define the term "knew" that the jurors were permitted implicitly to assign guilt based upon a "should have known" standard.

"Terms which are reasonably within the common understanding of juries, and which are not technical or unambiguous, need not be defined in the trial court's charge." *United States v. Anderton*, 629 F.2d 1044, 1048-49 (5th Cir. 1980) (citation omitted). "Knew" is such a self-defining term, and, when used in common parlance, connotes actual or direct cognition, not constructive awareness attributed to an individual because of his own negligence, gross negligence, or recklessness. Irrespective of whether it is in fact "better practice . . . to instruct the jury on the meaning of all terms of operative significance, even if they are in ordinary parlance," *id.* at 1049 n.5 (citation omitted), we find no error in the instant instruction.

Jerri next challenges the jury instruction on the § 1957 money laundering charge stemming from the purchase of her $90,000 home with monies that the government alleges were criminally derived (Count 15). According to the government, Allen gave Jerri $90,000 in drug-tainted money with which to purchase a home, which money Jerri deposited in amounts less than $10,000 each and then drew cashier's checks on in similar amounts.

The court instructed the jury that, in addition to the other four elements that they were required to find in order to convict, they must also find "[t]hat the monetary transaction was of a value greater than $10,000; [and] Fourth: That the criminally derived property was in fact derived from the specified unlawful activity of importation, sale or distribution of cocaine." Jerri contends, and the government concedes, that the instruction wrongly informed the jury that they must find only that the *monetary transaction in which the criminally derived monies were used* was in excess of $10,000, where in fact a correct statement of the law would require that the jury find that the *amount of criminally derived money used in the transaction* must exceed $10,000.

As Jerri failed to object timely, we review for plain error. *United States v. Restivo*, 8 F.3d 274, 278-79 (5th Cir. 1993), *cert. denied*, 115 S. Ct. 54 (1994). Because the government concedes errorSS"a deviation from a legal rule in the absence of a valid

9

waiver," *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied*, 115 S. Ct. 1266 (1995)§§and that such error was in fact plain§§so obvious that the trial judge and prosecutor were derelict in countenancing it, *see United States v. Frady*, 456 U.S. 152, 163 (1982), we need not determine whether Jerri's construction of § 1957 comports with its statutory meaning. We will exercise remedial discretion where the plain error affects substantial rights and where the defendant carries her burden to show that the error was prejudicial, affecting the outcome of the proceeding. *Calverley*, 37 F.3d at 164 (citation omitted).

Jerri argues that the instruction was indeed prejudicial because the government presented at trial only one cashier's check that was allegedly used in the purchase of her $90,000 home and that had any clear derivation from illicit funds. That check, in the amount of $8,000, listed Pierce as the remitter. Jerri thus contends that there is a substantial likelihood that the jury wrongly convicted her on Count 15 based upon the $90,000 purchase price of the home and that a different result would have been obtained had the jury been instructed to focus on the $8,000 cashier's check only.

Jerri's own discussion of the facts of this case, however, undermines this argument. Even if we assume that only this single cashier's check had any derivation from criminal activity, Jerri admits that she made currency deposits (the subject of a separate

10

structuring charge) over the course of a month from which she was able to pay the remaining $36,455.85 due on her home. It was precisely the criminal origin of these cash transactions that the government also presented to the jury in arguing for Jerri's conviction on the § 1957 charge.

Even though we acknowledge that Jerri disputes vigorously the notion that this cash was criminally tainted, this argument is unavailing to an inquiry of prejudice on the jury instruction. That is, the jury's decision to convict Jerri on the § 1957 charge hinged upon its belief or disbelief that Jerri knew that the minimum amount of $44,455.85 that the government contended was criminally tainted was in fact tainted. The correctness of the jury's decision is not properly at issue under our review of the court's erroneous jury instructions,[5] and, because the government's case posited that monies at least in excess of $10,000 were used in the purchase of Jerri's home, we find no prejudice.

                              C.

Hughes, Allen, and Jerri also assert as error the district court's failure to instruct the jury on the elements of the specified unlawful activitySSthe importation, sale, or distribution of cocaineSSthat formed the predicate act of the money laundering

---

[5] Jerri properly raises these concerns in her appellate issues dealing with the actual knowledge instruction and the sufficiency of the evidence presented to prove knowledge.

11

charges. They do not suggest that the court failed to instruct the jury that a finding of the specified illegal activity was required to establish proof of the money laundering claim,[6] but rather assert that the court's failure to enumerate the elements of the activity prohibited the jury from making the appropriate finding. We review the court's failure to adopt the defendants' proposed jury instruction under the *Pennington* test described above.

Assuming *arguendo* that the proposed instruction was a correct statement of law, we conclude that it was covered sufficiently in the court's instruction. The court instructed that it must find "[t]hat the property involved in the financial transaction did in fact represent the proceeds of some specified unlawful activity," defining "specified unlawful activity" as "any activity relating to the sale and distribution of controlled substances." The court further remarked that "I advise you that the importation, sale, or distribution of cocaine is a felony under federal law." Given that the drug traffickers themselves were not on trial and that the instructions track the statutory language and embody all of the essential elements of the crime, the instructions incorporate the defendants' proposed instruction substantially. *See United States*

---

[6] Even assuming that the defendants have raised this argument on appeal, we would review it under a plain error standard. Nowhere in Hughes's citations to his proposed jury instructions, by which he requested that the elements of the illegal activity be read to the jury, did he propose that the court specifically instruct the jury that they must find each of these elements in order to find that the illegal activity occurred. Rather, Hughes asked that the elements be read in connection with the mental state requirement of actual knowledge.

12

*v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995), *cert. denied*, 116 S. Ct. 1369 (1996).

The defendants' citations to *United States v. Lovett*, 964 F.2d 1029 (10th Cir.), *cert. denied*, 506 U.S. 857 (1992), and *United States v. McDuff*, No. 94-20076 (5th Cir. Mar. 12, 1996) (unpublished), do not convince us otherwise. *Lovett* addresses whether a charge under the money laundering statutes, once the defendant has been convicted of the predicate crime, raises a double jeopardy question. The court mentions in *dicta* only that the elements of the predicate crime are elements of the money laundering crime, but says nothing about the sufficiency of jury instructions in a money laundering case. *See Lovett*, 964 F.2d at 1041-42.

*McDuff* is also distinguishable, both because the predicate act was bank fraud, a crime for which, unlike cocaine importation and distribution in the instant case, most jurors would require a precise explication of the elements, and because the district court in *McDuff* never even mentioned the predicate act in the instructions on the money laundering claims. *Id.* at 8 ("FOURTH, the criminally derived property must also, in fact, have been derived from a specified unlawful activity."). In contrast, the court in the instant case made clear to the jurors that the predicate act was cocaine importation and distribution.

Finally, even if we assume that the defendants have satisfied the second prong of the *Pennington* test, they have not demonstrated

13

that the court's failure to give the instruction seriously impaired their ability to present a defense that the predicate crime had not in fact occurred. In fact, the only dispute was whether the money at issue had come from the specified unlawful activity, not whether the specified unlawful activity actually had occurred. In rejecting the defendants' proposed instruction, the court remarked:

> [S]muggling drugs and importing cocaine, is not a concept that I think is so foreign that you would have to sit and quote verbatim every statute that deals with that . . . . I mean, there is supposed to be some common sense in this, and the purpose of the jury charge is to tell people what the law is so that they can make a common sense factual determination, not to mire them.

We can find no evidence that raises any doubt that the jury would have found differently on the laundering claims had the elements been spelled out explicitly. In fact, we agree with the district court that doing so would "confuse them and . . . make their fact-finding mission more difficult by obfuscating common sense determination of the facts."

<br>

III.

Each of Hughes, Allen, and Jerri next contends that because there was insufficient evidence, the district court erred in allowing the money laundering claims to go to the jury. In particular, the defendants allege that the government presented insufficient evidence of their actual knowledge of the criminal taint of the money involved. In deciding whether there was

14

sufficient evidence to support the verdict, we view the evidence and the inferences that may be drawn in the light most favorable to the verdict and determine whether a rational jury could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Bustamente*, 45 F.3d 933, 936 (5th Cir.), *cert. denied*, 116 S. Ct. 473 (1995).  The jury is free to choose among reasonable constructs of the evidence, which need not exclude every reasonable hypothesis of innocence.  *Id.*  Furthermore, we accept all credibility choices that tend to support the verdict.  *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991).

A.

Hughes first challenges the sufficiency of the knowledge evidence with respect to Counts 4 (the July 21 Phoenix money pick-up) and 5 (the August 1 secondary loan of $1.9 million from Allen). Hughes contends that, because he did not meet with Chambers until August 8, a rational jury could not have found that he knew about the illegal origin of the monies prior to that time.  The government points us to several pieces of evidence from which it contends that the jury could have inferred that Hughes had actual knowledge of the criminal source of the funds, including Hughes's structuring activity that began almost immediately after his receipt of the initial $1 million, the fact that the proceeds of the loans were delivered in cash, Hughes's traveling with Allen to Phoenix to pick

15

up nearly $2 million in cash from a storage facility, and the jury's disbelief of Allen's Joe Brown story.

According to Hughes, the jury could not have ascribed any significance to the structuring because the jury declined to convict Hughes on Count 2 (the original $1 million loan from Betty Allen on June 27) but so convicted him on Count 4 (the $2 million Phoenix incident on July 21), notwithstanding the fact that the jury was aware that Hughes began making structuring transactions almost immediately after receiving the first $1 million. Had the jury found the structuring important, Hughes asserts, it would have convicted on Count 2 as well. We disagree.

Hughes's suggestion misunderstands the application of a money laundering charge to the events in question. The government properly noted in the indictment, and the court so instructed the jury, that Hughes could be found guilty of Count 2 only if he knew of the illegality of the proceeds *at the time of his receipt of the money*. Had the jury determined solely from the structuring evidence, all of which followed in time the June 27 receipt of $1 million, that Hughes had actual knowledge of the illegal source of the money at the time that he received the money, the jury would have been concluding, impermissibly, that Hughes should have known at the time he accepted the money that it was from an illegal source, because actions that he took subsequent to the receipt evinced such knowledge, *not* that he actually knew of its illegality

16

at the time of receipt. Rather, the first time the jury could have considered properly the structuring evidence was in their deliberations on Count 4, not Count 2.

Thus, the government notes correctly that, with respect to all counts that temporally followed Count 2, it posited a theory from which the jury could infer actual knowledge of the illegality of the proceedsSSevidence of Hughes's structuringSSand that Hughes's failure to debunk this theory when he took the stand entitled the jury to make such an inference.[7] We agree that Hughes's failure to present the jury with a competing explanation for the structuring entitled the jury to infer that his reason for so doing was to avoid government scrutiny about the illicit source of money.

In addition to Hughes's structuring, the jury also could have inferred knowledge from the all-cash nature of the transactions, Hughes's accompanying Allen to a storage warehouse in Phoenix wherein they found $2 million in cash that Hughes brought to Dallas, and the jury's own disbelief of Allen's Joe Brown story. Whether the jury believed, as Hughes wanted them to, that "[a]dmit-

---

[7] Hughes, as do Allen and Jerri, notes that there are a number of innocent reasons why one might wish to make deposits in such a way, and thus we should not allow the jury to conclude that the structuring evinced knowledge of the illegality of the proceeds. In fact, the defendants contend that *Ratzlaf v. United States*, 510 U.S. 135, 144-45 (1994), expressly acknowledges that structuring is "not inevitably nefarious." The *Ratzlaf* Court invoked such language, however, in response to the government's suggestion that it need not prove willfulness to sustain a conviction under 31 U.S.C. § 5324. We find nothing in *Ratzlaf* that would prohibit a prosecutor in an 18 U.S.C. § 1956 case from introducing structuring activities to evince a defendant's knowledge of the illegality of the monies being structured. The defendants had every opportunity to debunk the government's theory, and they may not now raise on appeal an alternative explanation for the structuring.

17

tedly, the July 21, 1989 "Phoenix Incident" was somewhat out of the ordinary" and that "Hughes was perhaps a bit naive in accepting that [Joe Brown] story, and perhaps (in twenty-twenty hindsight) he should have gone to greater lengths to verify its validity," turned upon its assessments of witness credibility and the weight of the evidence, functions that are well within the province of the fact-finder and that are beyond the scope of our review on appeal. We find that a rational jury could have made such decisions in the instant case.[8]

B.

Allen also challenges the sufficiency of the evidence to support the finding that she had knowledge of the criminal origin of the money. Allen notes correctly that Chambers testified that he never actually told her that his money was drug-tainted, and thus she concludes that the jury should have believed her Joe Brown story. What Allen neglects, however, is the additional evidence that Betty knew that Chambers had a drug problem, that she had testified at his detention hearing in May 1989, during which time

---

[8] Because we find sufficient evidence to affirm on Counts 4 and 5, each of which occurred prior to the August 8 meeting with Chambers, we need not address Hughes's sufficiency claims with respect to the subsequent counts. We note briefly, however, that, notwithstanding the variance between the parties' accounts of the meeting, Hughes does admit that at a minimum Chambers did indicate that the money belonged to him, that he had once worked for a man named Pablo Acosta, that he had inherited Acosta's "turf," and that Acosta was "like a godfather" to Chambers. A reasonable jury could have inferred from this additional evidence, when considered in light of the previous evidence of knowledge, that Hughes had knowledge of the illegality of the proceeds.

18

allegations of his drug dealing were made in her presence, that she held large sums of cash for Chambers in a safe in her house, that she instructed Hughes to structure his loan deposits, and that she had traveled with Hughes to Phoenix to collect $2 million in cash from a storage facility and with Jerri and Pierce to Alpine to collect an additional $1.9 million in cash. Whether, in light of this additional circumstantial evidence of knowledge, the jury disbelieved the Joe Brown story is beyond the scope of our review. A rational jury could have found sufficient evidence of knowledge beyond a reasonable doubt.

## C.

We similarly reject Jerri's sufficiency challenge.[9] Again, Jerri contends that Chambers's testimony that he never told her that he was in fact a drug dealer compels a reversal. The evidence did establish, however, that Jerri was aware of the large sums of

---

[9] As a preliminary matter, we must decide whether Jerri's sufficiency claim should be reviewed with reference to the evidence presented in the government's case-in-chief only or with reference to the additional testimony elicited by Jerri from Allen and her brother. Where a defendant rests his case at the end of the government's case-in-chief, a reviewing court may consider the sufficiency of the evidence solely from the evidence presented in the government's case-in-chief. *See United States v. Casilla*, 20 F.3d 600, 606 (5th Cir. 1994). Sufficiency review is similarly constrained where a defendant rebuts testimony offered against him by another co-party, without attempting to rebut the government's case-in-chief. *See United States v. Belt*, 574 F.2d 1234, 1237 (5th Cir. 1978). Where, however, a defendant introduces co-party testimony intended to exculpate him and uses that testimony in closing argument to support his case, a reviewing court may review all of the evidence presented. *See United States v. Cardenas Alvarado*, 806 F.2d 566, 570 n.2 (5th Cir. 1986). Because Jerri elicited testimony from Allen and her brother that was intended to exculpate her, and argued such evidence to the jury on closing, we may review all of the evidence presented.

19

Chambers's cash being stored in her mother's home, that she opened the safe on at least two occasions to allow Chambers to withdraw money, that she accompanied her mother and Pierce on the Alpine plan trip to pick up the $1.9 million in cash, and that she purchased a new home with monies that she had previously structured. Jerri did attempt to explain away her behavior with regard to her house purchase by eliciting testimony from Allen regarding the derivation of the monies, and she also invoked Betty's Joe Brown story. Yet, as was the case with Allen, the jury was within its rights to disbelieve this story and to conclude, in light of the other evidence, that Jerri knew of the criminal source of the monies.

D.

Hughes and Jerri next challenge the sufficiency of the evidence presented to prove that the financial transactions at issue were designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(I). In so doing, they argue that we should look not to their own intent, but rather to the intent of Chambers. Because, they allege, it is undisputed that Chambers never intended to conceal in any way the proceeds of his alleged unlawful activity, they cannot be held liable for money laundering.

This objection is without merit, as the following exchange on

20

direct examination between Chambers and the government illustrates:

> Q. And why did you start stashing your money in Marathon, Texas, with Betty Allen?
>
> A. Because I trusted her. She was my friend and I felt it was the safest place for my money at the time.
>
> Q. Did you have any intent to hide the money from law enforcement officers?
>
> A. Yes, ma'am.
>
> Q. And why is that, sir?
>
> A. Well, I wouldn't have any means to prove that it was mine.

The government need only prove that Hughes and Jerri were aware of Chambers's and Allen's intention to conceal or disguise the nature of the money, not that Hughes and Jerri themselves so intended. *See United States v. Campbell*, 977 F.2d 854, 858 (4th Cir. 1992), *cert. denied*, 507 U.S. 938 (1993). Additionally, the fact that Allen's and Chambers's names were listed on the promissory notes documenting the purported loan transactions does not undermine the government's case. *See Lovett*, 964 F.2d at 1034 n.3 (noting that the money laundering statute is "not aimed solely at commercial transactions intended to disguise the relationship of the item purchased with the person providing the proceeds; the statute is aimed broadly at transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership or control of the proceeds of unlawful activity.). The jury was entitled to infer from the defendants'

21

knowledge of the illegal source of the proceeds that they were aware of Allen's and Chambers's intent to conceal the monies. *See Campbell*, 977 F.2d at 858.

We disagree with defendants that *United States v. Dobbs*, 63 F.3d 391 (5th Cir. 1995), and *United States v. Gonzalez-Rodriguez*, 966 F.2d 918 (5th Cir. 1992), require anything different. In *Gonzalez-Rodriguez*, we reversed a money laundering conviction against the girlfriend of an alleged drug dealer because we noted that her disclosure to law enforcement officials that she was carrying $8,000 in cash followed by her turning the money over to the officials to count hardly evinced an intent to conceal or disguise the funds. *Id.* at 926. Where, as here, such intent is present, *Gonzalez-Rodriguez* is inapposite. Similarly, *Dobbs* merely reiterates the general requirement that the government must prove that the transactions were designed at least in part to launder money, "or otherwise to conceal the nature of funds so that it might enter the economy as legitimate funds." 63 F.3d at 397. The government has met its *Dobbs* burden.

V.

A.

Hughes next challenges the enhancement of his sentencing offense by four levels under U.S.S.G. § 3B1.1(a). He asserts both that the district court erred because it failed to find that Hughes

22

was a "leader or organizer" and because it had insufficient evidence to determine that the scheme was "otherwise extensive."

We review the factual finding that a defendant is a leader or organizer for clear error. *See United States v. Valencia*, 44 F.3d 269, 271-72 (5th Cir. 1995). "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Id.* at 272.

Section 3B1.1(a) has two requirements: (1) The defendant must have been an organizer or leader of one or more other participants in the criminal activity, and (2) the scheme must have either included five or more participants or been otherwise extensive. U.S.S.G. § 3B1.1(a). The commentary defines a "participant" as a person who is criminally responsible for the commission of the offense, but who need not have been convicted. *Id.* commentary n.1.; *United States v. Gross*, 26 F.3d 552, 554-55 (5th Cir. 1994).

We do not find clear error in the conclusion that the criminal activities were "otherwise extensive." The court noted that the record reflected the participation of numerous people conducting numerous transactions, including structuring 199 deposits in more than eleven financial institutions over a seven-month period. In light of the record as a whole, the court's findings are more than plausible.

Similarly, we reject Hughes's argument that the court failed to make a finding that he was a leader or organizer of one or more

criminally responsible persons. The court made an explicit finding of leadership: "So with regard to that, *as well as the direction that was being given*, I think the testimony specifically was that Ronald Hughes, Jr., was following orders of Ronald Hughes, Sr., as was Rhonda Hughes as well, in making these deposits." (Emphasis added.)

With respect to a finding regarding the criminal responsibility of those to whom Hughes gave directions, the district court adopted the presentence report ("PSR"), which contains a finding of criminal responsibility on the part of the Hughes children and the company comptroller. Specifically, the court stated, "All other objections affecting the guidleine calculations are overruled, and I accept the presentence report and the addendums thereto." Although the finding could have been made more specific, we do not see clear error in the determination of criminal responsibility.[10]

B.

Jerri objects to the district court's findings at her sentencing hearing. We have held that under the sentencing guidelines for conspiratorial conduct, a district court must find both (1) that the defendant agreed to undertake jointly criminal

---

[10] Hughes relies on *United States v. Ronning*, 47 F.3d 710 (5th Cir. 1995), to argue that as a matter of law he could not have been an organizer or leader. In *Ronning*, however, we said only that an organizer or leader, in order to be so classified, must control or influence other people. *Id.* at 712. The district court so found that Hughes acted as a leader with respect to Hughes, Jr., and this finding is not clearly erroneous.

24

activities and that the particular crime was within the scope of that agreement and (2) that he could have reasonably foreseen the criminal activity. *See United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993).

Although a court must make an express finding that the conspiratorial activity at issue satisfies these requirements, we nevertheless have rejected the proposition that the court must make a "catechismic regurgitation of each fact determined." *United States v. Sherbak*, 950 F.2d 1095, 1099 (5th Cir. 1992). Courts may adopt the findings of the PSR, but they must make it clear that they have so adopted the PSR, in order that the reviewing court is not left to second-guess the basis for the sentencing decision. *United States v. Carreon*, 11 F.3d 1225, 1231 (5th Cir. 1994).

We disagree with Jerri that the court failed to make findings that the monies attributed to her were within the scope of the agreement and were reasonably foreseeable to her. The probation office, in preparing the PSR, enhanced Jerri's sentence based upon her participation in the conspiracy to launder in excess of $3.5 million. In a written objection to the PSR, Jerri argued that she should not be held accountable for that entire amount, but rather that her liability was limited to the $90,000 used in the purchase of her home. The probation office, in response, filed a written addendum noting that the court was entitled to make such a finding, but, in any event, Jerri would not be entitled to a role reduction.

25

The district court at the sentencing hearing explicitly adopted the PSR and the addendum and entertained Jerri's objections.

Jerri again argued at the hearing that her responsibility was limited to the $90,000 home purchase "although she assisted her mother by attending that [August 8 Chambers] meeting much later after all the events were pretty well concluded." After a long colloquy with Jerri and with the government, the court finally overruled Jerri's objections, noting:

> I find the tape recording, clearly that aloneSSplus there was other evidence in this case. As I recall, there was the Sons of the West theater and the involvement with that.
>
> And, again, her participation, which certainly the participation in the discussion on that tape, as I recall it, would not be considered minimal. I mean, I seem to recall she was a player in the conversation.

The court's findings are not clearly erroneous. We agree with the government that "while the finding is not a model of clarity, it is plain enough when read in context" and demonstrates attention to the two *Evbuomwan* factors. Unlike the court in *Hooten*, 942 F.2d at 881, which summarily refused to address the defendant's objections to the PSR and thereby left no basis for the appellate court to review its factual findings, the instant court entertained Jerri's objections and ultimately found them factually erroneous. Thus, with an ample predicate for the court's findings on record, we find no clear error.

26

C.

Finally, Jerri argues that although the jury found that she knew the monies were derived from *some* specified unlawful activity, it never found expressly that she knew that the monies were derived from the importation, sale, or distribution of narcotics. Thus, she asserts, the enhancement of her sentence for involvement with narcotics or controlled substances is clearly erroneous. The PSR addressed this argument in a written addendum, noting that each of Count 1 and Count 15 under which Jerri was convicted required that the jury find that Jerri had knowledge that the source of the monies was from "some specified unlawful activity, that is, the sale and distribution of narcotics." Furthermore, the PSR made its own factual findings in this regard, pointing to the evidence in the record to support Jerri's awareness of the drug taint of the money.[11]

As noted above, the district court need not undertake a "catechismic regurgitation of each fact determined," *Sherbak*, 950 F.2d at 1099, but may adopt the factual findings of the PSR. The court so adopted the PSR in the instant case, and we do not see

_____

[11] Jerri cites *United States v. Medina*, 992 F.2d 573, 591 (6th Cir. 1991), *cert. denied*, 510 U.S. 1109 (1994), incorrectly to require in all cases that the district court (or PSR) make factual findings independent of the jury's findings. This reading is simply erroneous. *Medina* notes only that the jury's decision to convict a defendant, based in part upon their disbelief of the credibility of his testimony, is an insufficient basis upon which the sentencing court may then apply an obstruction of justice enhancement for perjury. *Medina* does not require generally that such independent findings must be made, but only that the court must do so where the jury's verdict is insufficient to meet the burden of proof required for the alleged enhancement.

clear error in its factual conclusions.

The judgments of conviction and sentence are AFFIRMED.